1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6                          SAN JOSE DIVISION

7

8    L.S.,                                Case No.  23-cv-02862-VKD

9                    Plaintiff,

10         v.                             **ORDER RE CROSS-MOTIONS FOR
                                          SUMMARY JUDGMENT**
11   MICHELLE KING,
                                          Re: Dkt. Nos. 12, 16
12                   Defendant.

13

14         Plaintiff L.S.[1] challenges a final decision of the Commissioner of Social Security

15   ("Commissioner")[2] denying his application for supplemental security income ("SSI") under Title

16   XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, *et seq.*  L.S.'s principle contention is

17   that the administrative law judge ("ALJ") did not properly assess the evidence and erred in

18   concluding that his drug and alcohol use is a contributing factor material to the determination of

19   disability.  The Commissioner maintains that the ALJ properly evaluated the evidence, and that

20   substantial evidence supports his finding that L.S.'s impairments, absent substance use, are not

21   disabling.

22         The parties have filed cross-motions for summary judgment.  Dkt. Nos. 12, 16, 19.  The

23   matter was submitted without oral argument.  Upon consideration of the moving and responding

24   _____

25   [1] Because orders of the Court are more widely available than other filings, and this order contains
     potentially sensitive medical information, this order refers to the plaintiff only by his initials.  This
26   order does not alter the degree of public access to other filings in this action provided by Rule
     5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).
27
     [2] Michelle King, the Acting Commissioner of the Social Security Administration, is substituted for
28   her predecessor pursuant to Federal Rule of Civil Procedure 25(d).

1    papers and the relevant evidence of record, for the reasons set forth below, the Court grants in part

2    and denies in part L.S.'s motion for summary judgment, grants in part and denies in part the

3    Commissioner's cross-motion for summary judgment, and remands this case for further

4    administrative proceedings consistent with this order.[3]

5    **I.    BACKGROUND**

6        L.S. was 31 years old on April 13, 2021, the date he filed his SSI application.[4]  *See*

7    AR[5] 34, 199, 250.  He reported struggling with depression from the time he was a child, following

8    his parents' divorce.  The record indicates that L.S. began drinking alcohol at around age 12, and

9    also began using cocaine and methamphetamines as an adult.  *See, e.g.*, AR 53, 58, 357, 404, 433.

10   L.S. has a history of juvenile detention, and has been in and out of jail and/or prison during his

11   adulthood.  *See, e.g.,* AR 38, 392, 403, 404, 405, 454, 497, 682.  The record indicates that he

12   attended school until the 6th grade, and later completed enough credits in an independent study

13   program for a high school diploma, but was unable to pass the high school proficiency exam.  *See*

14   AR 38, 255, 433, 518, 682.  L.S. has a history of unstable housing, as well as limited employment,

15   which includes brief periods working in a warehouse and in a fast food restaurant.  *See* AR 61.

16   The record indicates that while on probation in December 2021, L.S. attempted suicide by

17   hanging, followed by a second attempted suicide a few weeks later in January 2022 by an

18   overdose of his psychiatric medications.  *See generally* AR 534-679.

19       On April 13, 2021, L.S. applied for SSI, alleging disability beginning January 1, 2020 due

20   to depression and anxiety.  *See* AR 81, 199, 200.  He later amended his alleged onset date to the

21   date of his application, April 13, 2021.  *See* AR 37, 321, 330.  His application was denied initially

22   and on review.  AR 67-95.  ALJ David LaBarre held a hearing on April 29, 2022, at which a

23

24   ───────────────

     [3] All parties have expressly consented that all proceedings in this matter may be heard and finally
25   adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 7, 8.

26   [4] For purposes of this appeal, the focus is on whether L.S. was disabled between April 13, 2021,
     the date of his SSI application, and June 13, 2022, the date of the ALJ's decision.  *See* 20 C.F.R.
27   § 416.335.

28   [5] "AR" refers to the certified administrative record filed with the Court.  Dkt. No. 9.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    vocational expert ("VE") testified.  The ALJ issued an unfavorable decision on June 13, 2022.

2    AR 15-26, 32-66.

3          The ALJ found that L.S. has not engaged in substantial gainful activity since the April 13,

4    2021 alleged onset date.  AR 17.  The ALJ found that L.S. has the following severe impairments:

5    major depressive disorder; generalized anxiety disorder; oppositional defiance disorder;

6    schizophrenia; amphetamine induced disorder; and polysubstance abuse disorder.  AR 18.  The

7    ALJ found that L.S.'s impairments, including his substance use disorders, met the criteria for

8    disability under the Commissioner's Listing 12.03 (schizophrenia spectrum and other psychotic

9    disorders) and Listing 12.04 (depressive, bipolar, and related disorders).  AR 18.  The ALJ found

10   that absent substance use, L.S. would still have a severe impairment or combination of

11   impairments based on his remaining limitations; however, L.S. would be no more than moderately

12   limited in his mental functioning, and therefore would not have an impairment or combination of

13   impairments that meets or medically equals the severity of one of the impairments listed in the

14   Commissioner's regulations.  AR 20-22.  Additionally, the ALJ determined that if L.S. stopped the

15   substance use, then during the relevant period, he "had the residual functional capacity ["RFC"] to

16   perform a full range of work at all exertional levels," with the following non-exertional

17   limitations:

18               [L.S. is] limited to simple and routine, repetitive tasks, and making
             simple work related decisions; occasionally interact with coworkers,
19           but not in a tandem team or group setting; and no interaction with
             the public except only superficial interaction such as greeting
20           customers or directing a customer to the location of the nearest
             restroom.  He would [be] absent once per month.
21

22   AR 22-23.  The ALJ found that L.S. is unable to perform any past relevant work, has a marginal

23   education, and that transferability of job skills is not material to the determination of disability.

24   AR 25.  If L.S. were to stop the substance use, and based on his age, education, work experience,

25   and RFC, the ALJ determined that he can perform other jobs that exist in significant numbers in

26   the national economy—namely, garment bagger, sorter, and rack loader.  AR 26.  The ALJ

27   concluded that L.S. "would not be disabled if he stopped the substance use," that L.S.'s "substance

28   use disorder is a contributing factor material to the determination of disability," and that L.S. has

United States District Court
Northern District of California

not been disabled within the meaning of the Act at any time from the April 13, 2021 alleged onset date through the June 13, 2022 date of the ALJ's decision. *Id.*

The Appeals Council denied L.S.'s request for review of the ALJ's decision. AR 1-6. L.S. then filed the present action seeking judicial review of the decision denying his application for benefits.

## II.    LEGAL STANDARD

### A.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted). In this context, the term "substantial evidence" means "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) and *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by regulation on other grounds*); *see also Morgan*, 169 F.3d at 599 (citation omitted). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Ahearn*, 988 F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

### B.    Drug Addiction and Alcoholism ("DAA") Analysis

"An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). In cases involving DAA, the ALJ is required to apply the five-step sequential disability analysis twice. Social Security Ruling ("SSR") 13-2p,

United States District Court
Northern District of California

2013 WL 621536, at *6 (Feb. 20, 2013); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001). At the first stage of the DAA analysis, the ALJ conducts the five-step sequential analysis and determines whether the claimant is disabled based on all of the claimant's medically determinable impairments, including DAA. *Bustamante*, 262 F.3d at 955; SSR 13-2p, 2013 WL 621536, at *6. If the ALJ determines that the claimant's impairments, including DAA, are not disabling, then the inquiry ends, and the ALJ need not determine whether DAA is material to the determination of disability. *Bustamante*, 262 F.3d at 955; SSR 13-2p, 2013 WL 621536, at *5-6. If the ALJ finds that the claimant is disabled, and there is medical evidence of DAA, then the ALJ proceeds to the second stage of the DAA analysis, and applies the five-step sequential inquiry a second time to determine whether DAA is "material" to the disability determination. "'Materiality' is the degree to which an individual would still be found disabled if they stopped using drugs or alcohol." *Jessie L. v. Kijakazi*, No. 20-cv-09305-DMR, 2022 WL 2222964, at *2 (N.D. Cal. June 21, 2022); 20 C.F.R. § 416.935(b).

At the second stage of the DAA analysis, implementing regulations require an ALJ to "determin[e] which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." *Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007); *see also* 20 C.F.R. § 416.935(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."); SSR 13-2p, 2013 WL 621536, at *4 (same). "If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied." *Parra*, 481 F.3d at 747. However, "[i]f the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability." *Id.*; *see also* SSR 13-2p, 2013 WL 621536, at *9 ("We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA.").

"[W]hen evidence exists of a claimant's drug or alcohol abuse, the claimant bears the burden of proving that his substance abuse is not a material contributing factor to his disability."

*Parra*, 481 F.3d at 744-745; *see also id.* at 748.  "All adjudicators must provide sufficient information in their determination or decision that explains the rationale supporting their determination of the materiality of DAA so that a subsequent reviewer considering all of the evidence in the case record is able to understand the basis for the materiality finding and the determination of whether the claimant is disabled."  SSR 13-2p, 2013 WL 621536, at *2.

## III.    DISCUSSION

At the first stage of the DAA analysis, the ALJ found that L.S.'s impairments, including DAA, met the Commissioner's listing-level criteria for disability.  AR 18.  The chief point of contention in this appeal is whether, at the second stage of the DAA analysis, the ALJ erred in concluding that if L.S. stopped using drugs and alcohol, his remaining impairments would not be disabling and that DAA therefore is material to the disability determination.  AR 26.  L.S. argues that the ALJ relied on cherry-picked evidence in concluding that, other than L.S.'s suicide attempts in 2021 and 2022, "the record indicates minimal treatment with no evidence indicating that his abnormal signs and symptoms resulted in more than moderate limitations."  *See* AR 25.  L.S. argues that the ALJ erred in several additional respects including that the ALJ (1) failed to properly develop the record, (2) did not properly evaluate the prior administrative medical findings and a medical source statement, (3) improperly discredited L.S.'s statements regarding his symptoms, and (4) did not properly assess L.S.'s RFC.

### A.    Development of the Record

L.S. argues that the ALJ failed to fully develop the record "by not doing an adequate inquiry into the nature and extent of [L.S.'s] substance use" at the administrative hearing.  Dkt. No. 12 at ECF 9.  L.S. argues that the ALJ's allegedly inadequate inquiry is notable because "there are clear periods in the record of sobriety."  *Id.*  An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  L.S. has not persuasively articulated or identified any ambiguity or inadequacy in the record that would have triggered the ALJ's duty to develop the record.  The ALJ's decision reflects that he reviewed the record and assessed L.S.'s

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   functioning during both periods of sobriety and at times when the evidence indicated that he was

2   using substances.  *See* AR 19-20, 23-25.  The Court understands L.S. to take issue, not with any

3   purported ambiguity or inadequacy of the record, but rather with the ALJ's allegedly inadequate

4   analysis of the record evidence.  Those arguments are addressed below.

5       On the issue of whether the ALJ failed to develop the record, L.S.'s summary judgment

6   motion is denied and the Commissioner's cross-motion is granted.

7       **B.    DAA Materiality Finding**

8       "Many people with DAA have co-occurring mental disorders; that is, a mental disorder(s)

9   diagnosed by an acceptable medical source in addition to their DAA."  SSR 13-2p, 2013 WL

10  621536, at *9.  In such cases, a finding that DAA is material must be supported by "evidence in

11  the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be

12  disabled in the absence of DAA."  *Id*.  Social Security Ruling 13-2p states that there is no known

13  "research data that . . . can [be] use[d] to predict reliably that any given claimant's co-occurring

14  mental disorder would improve, or the extent to which it would improve, if the claimant were to

15  stop using drugs or alcohol."  *Id*.  Additionally, in considering periods of abstinence, there is no

16  "exact guidance on the length and number of periods of abstinence to demonstrate whether DAA

17  is material in every case."  *Id*. at *12.  However, the period of abstinence should be "long enough

18  to allow the acute effects of drug or alcohol use to abate."  *Id*.  "In some cases, the acute and toxic

19  effects of substance use or abuse may subside in a matter of weeks, while in others it may take

20  months or even longer to subside."  *Id*.  For some claimants, materiality may be determined "based

21  on evidence from a single, continuous period of abstinence," while for others, more than one

22  period may need to be considered.  *Id*.  "Especially in cases involving co-occurring mental

23  disorders, the documentation of a period of abstinence should provide information about what, if

24  any, medical findings and impairment-related limitations remained after the acute effects of drug

25  and alcohol use abated."  *Id*.  "Adjudicators may draw inferences from such information based on

26  the length of the period(s), how recently the period(s) occurred, and whether the severity of the co-

27  occurring impairment(s) increased after the period(s) of abstinence ended."  *Id*.

28      L.S.'s principle argument is that the ALJ's DAA analysis is flawed because he relied on

cherry-picked evidence—i.e., excluding L.S.'s suicide attempts—in concluding that L.S. has no more than moderate limitations in his mental functioning. *See* Dkt. No. 12 at ECF 12. The Commissioner argues that at the second stage of the DAA analysis, the ALJ properly excluded consideration of L.S.'s suicide attempts because records indicated that L.S. had used methamphetamines and/or consumed alcohol on both occasions. *See* Dkt. No. 16 at ECF 18; *see also, e.g.,* AR 544, 559, 566, 569, 624, 651.

In assessing the materiality of L.S.'s DAA, the ALJ reviewed evidence from periods when L.S. was incarcerated (during which L.S. presumably was abstinent), as well as periods when L.S. was not in custody. The ALJ compared those periods to the records encompassing L.S.'s two suicide attempts, which occurred while he apparently was on parole or probation. In particular, the ALJ focused on the period from around May 2019 to August 2020 when L.S. was not in custody; L.S.'s period of incarceration from August 2020 to around June 2021; and the records pertaining to L.S.'s suicide attempts in December 2021 and January 2022, which occurred while L.S. was not in custody. *See* AR 23-25.

### 1.    2019-2020 Parole

With respect to the period from May 2019 to around August 2020, when L.S. was on parole, records indicate that although he had been on medication (e.g., Vistaril, Remeron, and Buspar) while incarcerated, L.S. stopped taking his medication upon his release in around mid-May 2019, did not plan to continue with his medication, and did not continue with his medication, even after receiving a prescription. *See* AR 479, 480, 482, 484, 486, 487. Records also document that during this period, L.S. did not attend a number of mental health appointments at the Parole Outpatient Clinic (even though attendance was a condition of his parole) and did not return several phone calls from mental health providers at the clinic. *See* AR 478, 479, 480, 483, 484. With respect to the appointments that L.S. did attend, a May 22, 2019 progress note (also documented in a June 7, 2019 report) states that L.S. had a restricted affect, "was unable to interpret two of . . . three proverbs," and was only "able to remember 2 out of 3 object[]s" in 12 minutes. *See* AR 486, 487. The ALJ observed that L.S. had an "otherwise normal examination despite not being on his medication." AR 23, 487. Indeed, that progress note (written when L.S. had been on parole for

about a week), reported that L.S. was alert and "well oriented," with adequate hygiene and grooming; appropriate eye contact; clear, coherent speech; linear, goal directed thoughts; sleep "within normal limits even without medication"; and no suicidal thoughts or plan. AR 486.

The ALJ correctly noted a lack of evidence indicating that L.S. sought treatment for any of his conditions until March 2020 when L.S. dropped in at the clinic and stated that he was "probably depressed" and wanted to get back on his medication. AR 23, 484. L.S. was scheduled for a telemedicine appointment to get treatment started. AR 484. However, records indicate that L.S. did not answer his phone and did not return calls from a clinic mental health provider. AR 483. By the next treatment record, dated May 1, 2020 (when L.S. had been on parole for nearly one year), L.S. reported "feelings of paranoia, and feeling persecuted and followed," low energy, interrupted sleep, and low appetite. AR 481. The treating provider stated that L.S. spent much of the time asking for codeine or Xanax. *Id*. While L.S.'s mental status examination revealed no suicidal intent or plan, the treatment note documented impaired concentration, "dysphoric but not suicidal" mood, high anxiety, flat affect, impaired insight, poor judgment, and indicated that L.S. appeared to be paranoid or responding to internal stimuli. AR 481-482. L.S. was diagnosed with schizoaffective disorder. He was given a prescription for Vistaril, Buspar, and Remeron, and was also started on Zyprexa/olanzapine. AR 481-482.

L.S.'s next treatment note dated May 13, 2020 indicates that he had not picked up his medication because "he forgot to which pharmacy it was sent" and reported an ongoing problem of staying by himself to avoid conflicts or disappointment, including conflicts with his friends and family. AR 480. The treatment note otherwise reports that L.S. was "doing well," had a euthymic mood, and was "open and willing to talk about the issues that are problematic for him." *Id*.

The last treatment note in this portion of the record, dated June 10, 2020, states that L.S. still had not picked up his medication because he "forgot which pharmacy" and was "not sure if he has insurance coverage." AR 479. While the ALJ correctly observes that the treatment note shows a euthymic mood and does not document the same signs or symptoms recorded in the May 1, 2020 note, the June 2020 note also states that L.S. "was less talkative today" and "not willing to talk much," was "not currently working," and was moving around between friends and his sister

9

1   for housing.  AR 24, 479.

2        There is evidence that L.S. worked for several months from September or October 2019

3   through January 2020.  *See* AR 46-47, 230, 256.  However, the ALJ incorrectly states that L.S.

4   reported that "he was still working" at the time of the June 10, 2020 treatment note.  AR 24.  As

5   discussed above, that treatment note states that L.S. reported he was not working.  AR 479.

6        Subsequent records indicate that L.S. was not abstinent during this period.  Following his

7   arrest and incarceration in August 2020, an August 25, 2020 treatment record documents L.S.'s

8   report that while he "was not on any psychiatric medications currently," he had "us[ed] stimulants

9   for the past year daily," as well as cannabis (although L.S. "denie[d] using it frequently for the

10   past year when he [was] getting into the stimulants.").  AR 518.

11             **2.**       **2020-2021 Incarceration**

12        Records from L.S.'s period of incarceration from August 2020 to around June 2021, when

13   L.S. presumably was abstinent, also document missed mental health appointments (including

14   instances where L.S. reportedly refused to show up when called for his appointment).  *See, e.g.,*

15   AR 493, 496, 503, 505, 509, 514.  There is also evidence indicating that L.S. did some work while

16   in custody in the prison/jail kitchen, until he lost that job due to an alleged threat.  *See* AR 24, 508.

17   While he reported not being on medication in August 2020, subsequent records indicate that by

18   September 22, 2020, L.S. was being treated with psychiatric medication, that he was generally

19   compliant with his medications throughout his incarceration, and that he reported a decrease in

20   some symptoms with medication.  *See* AR 494, 496, 500, 502, 508, 514, 517, 523, 525-526, 527-

21   528.  For example, an August 25, 2020 mental status exam by Dr. Yang documented that L.S. was

22   "distracted and interactive with other inmates and occasionally laughing when making jokes to

23   [Dr. Yang]."  AR 518.  Dr. Yang noted that L.S. reported to "have occasional anxiety and

24   depression" and that L.S.'s affect was "not entirely congruent to reported mood."  *Id*.  L.S.

25   endorsed "vague auditory hallucinations."  *Id*.  As noted above, he also reported daily use of

26   stimulants (stating, "they calm me down") and less frequent use of cannabis in the past year.  *Id*.

27   Dr. Yang assessed unspecified depressive disorder (rule out substance induced mood disorder, rule

28   out adjustment disorder); unspecified psychosis (rule out substance related psychosis versus

United States District Court<br>Northern District of California

psychosis related to his mood); and severe alcohol, stimulant, and cannabis use disorders. *Id*. L.S. was prescribed Remeron/mirtazapine and Buspar. *Id*.

A September 17, 2020 mental status examination conducted about one month after L.S. was incarcerated, noted a depressed and anxious mood, as well as anxious affect, with L.S. reporting "chronic thoughts/feelings of hopelessness and helplessness" and "non-command [auditory hallucinations] that [L.S.] described as chatter in [h]is head." AR 520. The September 17, 2020 report noted that L.S.'s hallucinations were "[p]ossibly drug-induced as [he] reported chronic amphet[amine] [and] [alcohol] abuse." AR 520. L.S.'s diagnoses included unspecified major depressive disorder; unspecified anxiety disorder; severe amphetamine-type substance use disorder; severe alcohol use disorder; rule out unspecified schizophrenia spectrum and other psychotic disorder; and rule out amphetamine (or other stimulant)-induced depressive disorder. AR 521. A September 22, 2020 record indicates that L.S. was taking Buspar and mirtazapine, with 86%-100% compliance. AR 523. By September 29, 2020, L.S.'s medication compliance was noted to be 100%. AR 526. An October 12, 2020 record shows that he was observed to have an anxious mood and constricted affect. AR 528. He reported that his medications were working, that he felt they controlled his mood and irritability, and that he experienced less frequent mood swings since starting his medication, but he still felt overwhelming anxiety; and while he did not feel hopeless or suicidal, he still experienced moments of sadness. *Id*. L.S. was assessed with adjustment disorder with mixed emotions and mood, and his dosage of Buspar and Remeron were increased to target residual anxiety. *Id*.

A January 26, 2021 record documented L.S.'s anxious mood and constricted affect, and noted that L.S. denied suicidal intent and did not appear to be internally preoccupied, but reported that his anxiety was "7/10." AR 502. L.S.'s prescription for Buspar and Remeron were continued, and he was also started on Lexapro. *Id*. According to a March 15, 2021 treatment note, L.S. reported that his anxiety was still high and that he was having sleep issues. He was observed to have an anxious mood and constricted affect and appeared to be "med seeking." His diagnosis was updated to adjustment disorder with depression and anxiety. His dosage of Buspar and Remeron were increased. At his request, Lexapro was discontinued. AR 508. Records

indicate that L.S. refused to appear for a mental health treatment appointment in April 2021 and that his medication was stopped due to his refusals to appear for treatment.  *See* AR 509-512, 514. The last treatment note in this record, dated June 1, 2021, states that L.S. presented with an "alright" mood and euthymic affect, that he denied any suicidal intent, and asked to continue medications for anxiety and sleep.  AR 514.  His dosage of Buspar and Remeron were increased. *Id.*

Records suggest that L.S. was released from custody sometime in the summer of 2021. *See* AR 514 (June 1, 2021 record referencing "Release meds" and "Discharged planning housing, Medical and mental health services"); *see also* AR 508 (March 15, 2021 record noting that L.S. was "[l]ooking forward to getting out in August").  There are no further records until L.S.'s hospitalization following his suicide attempts in December 2021 and January 2022.

### 3.    December 2021 and On

Records indicate that on December 8, 2021, L.S. was brought to the emergency department after attempting suicide by hanging at a motel.  L.S. was noted to be "uncooperative but alert and oriented, acting bizarre" and "paranoid," and that he refused treatment and anti-anxiety medication.  Toxicology results show that L.S. was positive for methamphetamine and opiates. AR 623, 629, 634, 639.  Records indicate that he also reported drinking alcohol the day before the suicide attempt.  *See* AR 630.  On December 9, 2021, LS was placed on a 5150[6] hold at the John George Psychiatric Hospital, where he was observed to be disheveled, with a depressed and irritable mood; inappropriate affect that increased in intensity; psychomotor retardation; pressured speech; concrete and tangential thought process; abnormal thought content with delusions, hallucinations, and suicidal ideation; limited insight; and impaired judgment due to psychosis.  He was discharged on December 21, 2021, with a prescription for olanzapine and diagnoses including schizophrenia, depressive disorder, and amphetamine induced disorder.  AR 668, 669, 674, 678.

On January 4, 2022, L.S. presented in an altered mental state at the emergency department

---

[6] *See* Cal. Welf. & Inst. Code § 5150.

after another suicide attempt in which he was found unresponsive at home.[7]  It was later

determined that L.S. overdosed on olanzapine.  Toxicology results showed that L.S. was positive

for amphetamines and alcohol.  He was observed to be "[i]nitially guarded and disengaged,

although cooperative to answering some questions."  He had impoverished speech and depressed

mood, and his affect was noted as "[e]ven, restricted, and flat," with a "detached and indifferent"

quality.  His thought process was linear, and his insight and judgment were impaired.  He was

placed on a 5150 hold, monitored for over 54 hours, and then transferred to the John George

Psychiatric Hospital, where he was observed to be disheveled, restless and fidgety, with an

anxious and irritable mood, an affect that was increased in intensity, and limited insight and

judgment.  Additionally, reports note that L.S. denied using any substances or alcohol, even

though, as noted above, test results showed he was positive for both methamphetamines and

alcohol.  He also minimized the seriousness of his overdose.  After a few days, L.S. was

discharged with diagnoses of schizophrenia, depressive disorder, and well as alcohol-, cannabis-,

and methamphetamine-related disorders.  AR 535-542, 544, 554-555, 650, 652, 653, 656.

        Following L.S.'s January 2022 hospitalization, there is no indication that he received any

follow-up mental health treatment.  However, on April 11, 2022, Laura Jean Catlin, Psy.D.

conducted a psychological disability evaluation.  *See* AR 680-692.  In her mental status

examination, Dr. Catlin documented L.S.'s depressed and anxious mood; goal-directed and logical

thought process; and clear, coherent, and spontaneous speech.  AR 683.  L.S. reported some

suicidal thoughts, without plans or intent; admitted to auditory hallucinations; and stated that he

felt the television was talking about him.  Dr. Catlin noted that L.S.'s "thought content evidenced

some perseveration on negative thinking and paranoia" and that "[t]here were signs of a formal

thought disorder."  *Id*.  She assessed L.S. with limited insight and judgment.  *Id*.  She also

documented L.S.'s reports that he wakes one to two hours early and cannot fall back asleep; lacks

sufficient energy "to do very much"; has more difficulty concentrating than he used to; and has

less appetite than usual.  AR 683-684.  She ultimately assessed L.S. with overall "marked"

---

[7] Records indicate that L.S. was living with his sister at that time.  *See* AR 553.

United States District Court
Northern District of California

limitations in all areas of mental functioning.  AR 689-690.

At the April 22, 2022 administrative hearing, L.S. testified that he was not still using any drugs or drinking alcohol, and that the last time he had done so was in December 2021 or January 2022.  AR 51.  Additionally, L.S. testified that he currently was taking medications for depression and anxiety, but that he ran out of his medications sometime in early 2022.  AR 52.

### 4.    Analysis

In reviewing these records, the ALJ concluded that L.S. "primarily exhibited abnormal mood and affect and occasional episodes of hallucinations and/or paranoia with or without prescribed treatment," but that "[t]he record does not indicate that these abnormalities resulted in more than moderate severity or limitation *apart* f[rom] the two occasions [i.e., L.S.'s suicide attempts] where [L.S.] was actively abusing substances."  AR 25 (emphasis added).  The ALJ thus singled out L.S.'s suicide attempts as "the only periods [L.S.] did exhibit marked, arguably extreme limitations" while "actively abusing substances."  AR 25.  He contrasted those suicide attempts with evidence from L.S.'s 2019-2020 parole and 2021-2020 incarceration periods as to which the ALJ found that "the record indicates minimal treatment with no evidence indicating that [L.S.'s] abnormal signs and symptoms resulted in more than moderate limitations."  *Id*.  The ALJ further stated that L.S.'s "lack of treatment, noncompliance with medication, and his work activities suggest that his impairments, although moderate in severity, would not prevent him from performing basic work activities within the residual functional capacity assessed above."  *Id*.  L.S. argues that the ALJ erred in excluding evidence of his suicide attempts in determining that the record supports no more than moderate limitations in his mental functioning.  Dkt. No. 12 at ECF 12.  The Commissioner argues that the ALJ properly evaluated L.S.'s ability to function "both during periods of sobriety and when evidence showed he was abusing substances."  Dkt. No. 16 at ECF 18.  The Court agrees with L.S.

The ALJ's decision to compare L.S.'s suicide attempts with his 2019-2020 parole and his 2020-2021 incarceration periods appears to be based on the premise that L.S. was using substances only in the period around his suicide attempts.  However, as discussed above, records indicate that L.S. was not abstinent during his 2019-2020 parole, and document his reported daily

1   use of stimulants (stating, "they calm me down") and less frequent use of cannabis during that

2   period. *See* AR 518.  The Commissioner appears to contend that when compared to other points

3   in time, L.S.'s suicide attempts are the only periods when L.S. was "*clearly* abusing substances."

4   *See* Dkt. No. 16 at ECF 11 n.3 (emphasis added).  However, the record is replete with

5   documentation of L.S. alcohol consumption since age 12 and his use of

6   cocaine/methamphetamines beginning in 2018.  *See, e.g.,* AR 58, 357, 360, 361, 404, 433, 456,

7   457, 518, 528.  Records documenting L.S.'s reported substance use during his 2019-2020 parole

8   call into question whether that period is an appropriate basis for comparison in the context of a

9   DAA materiality analysis.  To the extent the ALJ cited L.S.'s 2019-2020 parole records as

10  evidence of his ability to function "to the point of nondisability *in the absence of DAA*," SSR 13-

11  2p, at *9 (emphasis added), the ALJ's analysis is not supported by substantial evidence.

12       While L.S. presumably was abstinent during his 2020-2021 incarceration and appeared to

13  experience some improvement in his mental health symptoms during that period, Social Security

14  Ruling 13-2p acknowledges that "[i]mprovement in a co-occurring mental disorder in a highly

15  structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due

16  at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation

17  of substance use."  SSR 13-2p, 2013 WL 621536, at *13.  Accordingly, the DAA materiality

18  determination requires "evidence from *outside of such highly structured treatment settings*

19  demonstrating that the claimant's co-occurring mental disorder(s) has improved, or would

20  improve, *with abstinence*."  *Id.* (emphasis added).  To the extent the ALJ cited to L.S.'s 2020-2021

21  incarceration records as evidence of improvement, the ALJ does not distinguish the effects of

22  L.S.'s medication compliance and placement in a highly structured incarceration setting from

23  L.S.'s presumed abstinence during this period.  This Court agrees with others in this district that

24  conclude that "materiality is not shown where the evidence does not separate the effects of the

25  structured environment and the purported sobriety."  *Jessie L.*, 2022 WL 2222964, at *17 (citing

26  cases).

27       There remains the period from around January 2022 through the date of the ALJ's June 13,

28  2022 decision.  L.S. testified that he stopped using any drugs or alcohol around January 2022, and

also ran out of his psychiatric medications at around this time. AR 51. As discussed above, there is no indication that he had any follow-up mental health treatment after his January 2022 hospitalization. Nor is there any indication that L.S. was in custody or other highly structured environment during this period. Evidence of his mental functioning at around this time includes L.S.'s own testimony and Dr. Catlin's medical source statement. As discussed below, the ALJ did not properly assess this evidence. To the extent the ALJ appeared to discount both L.S.'s testimony and Dr. Catlin's opinion as inconsistent with L.S.'s behavior around the period of his suicide attempts as compared to his behavior prior to those events, the ALJ's analysis is not supported by substantial evidence for the reasons discussed above.

* * *

In sum, because it is not apparent from the record or from the ALJ's analysis that objective findings from the periods prior to L.S.'s suicide attempts are representative of L.S.'s functioning in the absence of DAA or outside a highly structured environment, the ALJ's DAA materiality determination is not supported by substantial evidence.

### C.    Prior Administrative Medical Findings and Medical Source Statement

L.S. argues that, in assessing his ability to function when not using drugs or alcohol, the ALJ erred in finding the prior administrative medical findings of the state agency consultants "most persuasive," and the opinion of Dr. Laura Jean Catlin, Psy.D. "less persuasive." The Commissioner maintains that the ALJ gave valid reasons, supported by substantial evidence, for his assessment of the prior administrative medical findings and Dr. Catlin's opinion.

#### 1.    Prior Administrative Medical Findings

On July 1, 2021, upon the initial review of L.S.'s SSI application, state agency consultant Howard Leizer, Ph.D. reviewed L.S.'s records, focusing primarily on the period from June 2019 to June 2020 (when L.S. was on parole) and subsequent records from 2020 through June 1, 2021 (when L.S. was incarcerated), described above. *See* AR 69-71. Dr. Leizer found that L.S. had the following medically determinable impairments (in order of priority): depressive, bipolar, and related disorders (primary, severe); substance addiction disorders (secondary, nonsevere); and anxiety and obsessive-compulsive disorders (other, severe). AR 72. He determined that L.S. did

United States District Court
Northern District of California

1    not meet the criteria for Listing 12.04 for Depressive, Bipolar, and Related Disorders, finding that

2    L.S. had mild limitations in his ability to understand remember, or apply information; mild

3    limitations in his ability to adapt or manage himself; and moderate limitations in in his abilities to

4    interact with others and to concentrate, persist, or maintain pace.  AR 72-73.  Additionally, Dr.

5    Leizer found L.S.'s statements regarding his symptom-related limitations to be "partially

6    consistent" with the record evidence, noting that the severity of the reported symptoms were not

7    fully supported by objective findings.  AR 74.

8         With respect to L.S.'s mental RFC, Dr. Leizer assessed that L.S. had no limitations in his

9    ability to understand and remember; no limitations in his ability to adapt; moderate limitations in

10   concentration, persistence, and pace; and moderate social interaction limitations.  AR 75-77.  With

11   respect to concentration, persistence, and pace, Dr. Leizer found no significant limitations in

12   L.S.'s ability to carry out very short and simple instructions, carry out detailed instructions, or

13   make simple work-related decisions.  Dr. Leizer assessed moderate limitations in L.S.'s ability to

14   maintain attention and concentration for extended periods; perform activities within a schedule,

15   maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary

16   routine without special supervision; and to complete a normal workday and workweek without

17   interruptions from psychologically based symptoms and to perform at a consistent pace without an

18   unreasonable number and length of rest periods.  Dr. Leizer explained that L.S. "[c]an maintain

19   [concentration, persistence, and pace] and attendance and adhere to supervisory strictures."

20   AR 75-76.  With respect to social interaction limitations, Dr. Leizer found no significant

21   limitations in L.S.'s ability to ask simple questions or request assistance, and assessed moderate

22   limitations in L.S.'s ability to interact appropriately with the general public; accept instructions

23   and respond appropriately to criticism from supervisors; get along with coworkers or peers

24   without distracting them or exhibiting behavioral extremes; and maintain socially appropriate

25   behavior and adhere to basic standards of neatness and cleanliness.  AR 76-77.  Dr. Leizer

26   explained that L.S. is able to maintain interpersonal expectations with limited contact.  AR 77.

27   The initial disability determination also notes that while "[s]ubstance abuse is documented . . . a

28   DAA material determination is not required."  AR 79.

United States District Court
Northern District of California

On November 19, 2021, on reconsideration of L.S.'s application, and apparently based on review of the same records, Dr. Sergiy Barsukov, Psy.D. affirmed Dr. Leizer's findings, noting that L.S.'s treatment appeared minimal, with multiple "no shows," and that records indicated that L.S. was "med seeking" and "wants meds for sleep [and] anxiety [and] reports insomnia, stress[.]" AR 84-86, 91.

The prior administrative medical findings were made before L.S.'s attempted suicides in December 2021 and January 2022. *See generally* AR 534-679.

### 2. Dr. Catlin's Medical Source Statement

On April 11, 2022, Dr. Catlin conducted a psychological disability evaluation of L.S. *See* AR 680-692. Her subsequent April 16, 2022 report indicates that her evaluation is based on a telephone[8] interview of L.S.; a review of L.S.'s 2022 records from the John George Psychiatric Hospital, 2019 records from San Quentin Prison, and 2018 records from Santa Rita Jail; as well as her administration of the Montreal Cognitive Assessment, the Beck Depression Inventory, and the DSM-5 Post-Traumatic Stress Disorder ("PTSD") Checklist. AR 681.

Dr. Catlin stated that L.S. was responsive during the examination and appeared to be a credible historian. *Id.* She noted his personal, medical, and legal history. AR 682-683. With respect to L.S.'s history of substance use, Dr. Catlin stated that L.S. "reported he stopped using drugs several years ago and has 'slowed down' on his alcohol intake this year and reported he only drinks in moderation." AR 683. She also noted L.S.'s prior psychiatric hospitalization in December 2021 following his first suicide attempt, as well as his psychiatric hospitalization in January 2022 after his second suicide attempt. *Id.*

Dr. Catlin noted "some difficulty" in L.S.'s activities of daily living, stating that L.S. reported he was able to perform some household chores (i.e., wash dishes, do laundry, and take trash out), go grocery shopping by himself, make simple microwavable meals, and take public transportation. AR 681. However, Dr. Catlin noted that L.S. "no longer participates in pleasurable activities," "spends a lot of time alone," "has difficulty concentrating and

---

[8] Dr. Catlin's report states that she conducted her evaluation by phone due to the COVID-19 pandemic. AR 681.

United States District Court
Northern District of California

1    remembering to do important things without reminders," and "has difficulty with hygiene and

2    basic self-care activities." AR 681-82. She further stated that L.S. "has difficulty interacting with

3    people because of his depression, which has caused problems maintaining employment and

4    problems with his relationships with friends and family." AR 681.

5    As discussed above, Dr. Catlin's mental status examination indicates that L.S.'s response

6    time to questions was within the normal range, and that he "appeared to be engaged in the

7    evaluation and able to sustain his attention," but she also noted that "these observations are only

8    an approximation," as her evaluation was conducted by phone. AR 683. Dr. Catlin documented

9    L.S.'s depressed and anxious mood; goal-directed and logical thought process; and clear, coherent,

10   and spontaneous speech. *Id.* L.S. reported some suicidal thoughts, without plans or intent;

11   admitted to auditory hallucinations; and stated that he felt the television was talking about him.

12   Dr. Catlin noted that L.S.'s "thought content evidenced some perseveration on negative thinking

13   and paranoia" and that "[t]here were signs of a formal thought disorder." *Id.* She assessed L.S.

14   with limited insight and judgment. *Id.* She also documented L.S.'s reports that he wakes one to

15   two hours early and cannot fall back asleep; lacks sufficient energy "to do very much"; has more

16   difficulty concentrating than he used to; and has less appetite than usual. AR 683-684.

17   With respect to L.S.'s cognitive functioning, L.S. scored 12 out of 22 possible points on

18   the Montreal Cognitive Assessment, indicating mild cognitive impairment. AR 684. Dr. Catlin

19   stated that because this test was conducted over the phone, L.S.'s test results are not a definitive

20   diagnosis, "but rather an indication that more testing should be considered." *Id.* L.S. was oriented

21   to the month, day, year, place, and city. AR 685. He was able to recall and repeat three of five

22   words read to him on one memory trial, and four of five words on the second trial. *Id.* On a

23   delayed recall subtest, he was able to remember four of the five words previously read to him.

24   AR 685. L.S. was able to tap or clap whenever he heard the letter "A" read in a string of letters,

25   and to repeat two short sentences that were read to him separately. AR 684. However, he was

26   unable to correctly recall and repeat a series of three and five numbers (in forward or reverse

27   order), and was unable to perform within the normal range when asked to count backward from

28   100 by serial sevens. *Id.* He was unable to say how two words were alike. *Id.* While he was able

1  to identify five words that start with the letter "F" in one minute, Dr. Catlin noted that the average

2  is more than ten words.  *Id.*

3          On the Beck Depression Inventory, L.S. scored a 45, indicating "symptoms of extreme

4  depression."  AR 685.  She noted that L.S. reported "feeling sad, unhappy, guilty, pessimistic," "a

5  lack of pleasure in life," "crying a lot," feeling "disappointed in himself" and being "self-critical a

6  lot of the time."  *Id.*  She also documented L.S.'s reports of having "difficulty making decisions,"

7  a lack of interest in things, and a lack of "energy to do the things he knows he should do."  *Id.*  Dr.

8  Catlin further noted that L.S. "sleeps most of the day but feels fatigued and tired all day too,"

9  "often feels agitated" and "very irritable," and reported "thoughts of ending his life[,] but would

10  not carry them out."  *Id.*

11          L.S. scored a 73 on the PTSD Checklist, suggesting that he meets the criteria for PTSD.

12  AR 685.  Dr. Catlin reported that L.S.'s profile indicates that he has experienced repeated,

13  disturbing memories, thoughts, or images of a stressful past event; has experienced feelings of

14  reliving the stressful event; avoids thinking or talking about the event and avoids situations that

15  remind him of it; has difficulty falling and staying asleep; feels emotionally numb; has a loss of

16  interest in activities he used to enjoy; is more irritable and sometimes has angry outbursts that he

17  cannot control; and is hypervigilant of his surroundings with an exaggerated startle response.  *Id.*

18          Dr. Catlin listed her diagnostic impressions, including "Major Depressive Disorder,

19  recurrent with psychotic features—Provisional," "Substance/Medication-Induced Psychotic

20  Disorder—Amphetamine—rule out," "Alcohol Use Disorder," and "Stimulant Use Disorder—in

21  partial remission."  AR 686.  While noting that L.S.'s history of substance use is a "complicating

22  factor in [his] evaluation," Dr. Catlin opined that L.S.'s "substance abuse did not contribute to or

23  cause his mental health disorder but rather [is] a consequence of his inability to manage the

24  emotional pain and depression he was experiencing as a child."  AR 687.  She explained that "[a]

25  consequence of using substances early in his life was that [L.S.] really never learned how to

26  manage his emotions or manage frustration in a productive or healthy way as an adult," and

27  "[i]nstead of maturing and learning how to effectively manage emotional discomfort [L.S.] just

28  turned to using substances."  *Id.*  Dr. Catlin noted that L.S.'s continued alcohol use "is a good

United States District Court
Northern District of California

United States District Court
Northern District of California

indication that he is still suffering from severe mental health problems and knows no other way to manage his symptoms." *Id.* She further stated that "because of [L.S.'s] history of methamphetamine use it is difficult to determine if his hallucinations and paranoi[a] are due to his mental health conditions or are a result of his methamphetamine abuse because both disorders can manifest these symptoms." *Id.*

Dr. Catlin assessed L.S. with mostly "Marked," as well as some "Mild," "Moderate," and "Extreme" limitations in his mental functioning, with an overall assessment of "Marked" limitations in his abilities to understand, remember, and apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. AR 689-690. She estimated that L.S. would be absent from work four or more days per month and would be off-task more than 30% of an eight-hour workday. AR 690-691. She concluded that "[o]verall, [L.S.] will have great difficulty performing well and consistently in the work place," noting that "[b]ecause [L.S.] has fewer internal resources to manage stress and mental demands[,] he is vulnerable to decompensation." AR 688.

### 3. Legal Standard

Under the regulations that apply to L.S.'s application, the Commissioner does not give specific evidentiary weight to medical opinions and prior administrative medical findings, including the deference formerly given to the opinions of treating physicians. Instead, the Commissioner evaluates the "persuasiveness" of all medical opinions and prior administrative medical findings in the record based on: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c; *see also Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022) ("For claims subject to the new regulations, the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies."). The "ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Woods*, 32 F.4th at 787.

United States District Court
Northern District of California

Supportability and consistency are considered the most important factors, and the ALJ is required to explicitly address them in his or her decision. 20 C.F.R. § 416.920c(b)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the relevant objective medical evidence." *Woods*, 32 F.4th at 791-92 (cleaned up; quotations and citation omitted). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." *Woods*, 32 F.4th at 792 (cleaned up; quotations and citation omitted)). "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). The ALJ "may, but [is] not required to," explain how he or she considered the remaining three factors listed in the regulations. *Id.* § 416.920c(b)(2).

### 4. Analysis

At the first stage of the DAA analysis, and taking L.S.'s DAA into account, the ALJ found the prior administrative medical findings "partially persuasive," noting that those findings were made before L.S.'s December 2021 and January 2022 hospitalizations for his attempted suicides. AR 20. Nevertheless, the ALJ stated that the prior administrative medical findings "at the time they occurred, were supported by the objective medical evidence, . . . which does not indicate any evidence of more than moderate limitation." *Id.* The ALJ also found Dr. Catlin's medical source statement "partially persuasive." He found her diagnosis of "Stimulant Use Disorder—in partial remission" and her ruling out of "Substance/Medication-Induced Psychotic Disorder-Amphetamine" inconsistent with L.S.'s "two hospitalizations that had just occurred 3 and 4 months prior." AR 20. While he agreed that Dr. Catlin's assessment of L.S.'s functional limitations were "reasonable" when L.S. "is abusing substances based on the December 2021 and

January 202[2][9] records" relating to L.S.'s suicide attempts, the ALJ said that Dr. Catlin's opinion was "not supported by the record prior to these hospitalizations, which includes no more than moderate severity related to his mental impairments. *See id.* (citing records from L.S.'s 2019-2020 parole and 2020-2021 incarceration periods).

At the second stage of the DAA analysis, when assessing L.S.'s functioning absent substance use, the ALJ found the prior administrative medical findings to be "most persuasive," stating that those findings "are consistent with and supported by the overall medical evidence of record, outlined above, indicating that with or without medication, the objective findings were relatively normal . . .." AR 25. The ALJ found Dr. Catlin's opinion "less persuasive when substance abuse is not involved," explaining that "[t]he overall medical evidence of record, outlined above, indicates that the only periods [L.S.] did exhibit marked, arguably extreme, limitations was during his 2021 and 2022 hospitalization[s] when [he] attempted suicide after taking street drugs, using alcohol, and/or overdo[s]ing on his prescribed medication." *Id.*

The Court has reviewed and considered the parties' arguments regarding the ALJ's evaluation of the prior administrative medical findings and Dr. Catlin's opinion. *See* Dkt. No. 12 at ECF 13-15; Dkt. No. 16 at ECF 13-17; Dkt. No. 19 at ECF 6-7. With respect to the ALJ's decision to discount Dr. Catlin's diagnoses and/or findings indicating that L.S.'s substance use is in remission, the Court finds no error. Although L.S. maintains that the ALJ misread or misconstrued Dr. Catlin's report, the record is reasonably susceptible to the ALJ's interpretation. Nevertheless, the extent to which Dr. Catlin may or may not have believed L.S.'s report that he decreased his alcohol consumption and stopped using drugs years before Dr. Catlin's evaluation is not dispositive of the matter. As is evident from the ALJ's decision, the crux of his assessment of the prior administrative medical findings and Dr. Catlin's opinion rests on the premise that L.S. was using substances only in the period around his suicide attempts. For the reasons discussed above, the ALJ's analysis on that point is not supported by substantial evidence. His decision to credit the prior administrative medical findings and to discount Dr. Catlin's opinion on that same

---

[9] The Court assumes that the ALJ's reference to the date "January 2021" was inadvertent.

1   basis therefore is also not supported by substantial evidence.

2       Accordingly, on this issue L.S.'s summary judgment motion is granted, and the

3   Commissioner's cross-motion is denied.

4       **D.    L.S.'s Testimony**

5           **1.    Summary**

6       L.S. testified that his depression began in childhood when his parents divorced.  AR 53.

7   He stated that he feels depressed "[e]very day" and "want[s] to cry," does not "like to open up

8   to . . . anyone because [he is] ashamed and embarrassed or what they['re] going to say," lacks

9   energy, and lost "motivation and determination to do anything because [of his] paranoia and

10  anxiety."  AR 54.  On a scale of one to ten, with ten being the most anxious, L.S. described his

11  anxiety as a "ten," and stated that he is "scared of everyone and can't trust anymore."  AR 55-56.

12  He said that his anxiety "makes [him] not want to do anything," adding that he is "scared to go

13  out" or "to be around people."  AR 56.  When asked if he has issues following instructions, L.S.

14  responded that "it's hard for [him] to pick up when someone's telling something," stating that he

15  "need[s] someone to show [him.]"  AR 56-57.  He testified that he cannot keep up with his

16  appointments.  AR 57.  He endorsed isolating himself from others, having difficulty finishing

17  things that he starts, being easily distracted, and having problems missing days of work or not

18  showing up on time.  AR 58-59.

19      The ALJ found that while L.S.'s medically determinable impairments could reasonably be

20  expected to produce the alleged symptoms," his "statements concerning the intensity, persistence,

21  and limiting effects of these symptoms are not entirely consistent with the medical evidence and

22  other evidence in the record[.]"  AR 23.  The ALJ explained that "evidence prior to [L.S.]'s

23  amended onset date indicates that" his mental impairments, while severe, "do not result in more

24  than moderate impairment except when [he] abused substances."  *Id*.  The ALJ also discounted

25  L.S.'s allegations regarding his symptoms based on a lack of treatment or poor treatment

26  compliance and L.S.'s work activities.  AR 23-25.  In explaining his decision, the ALJ cited to

27  records from L.S.'s 2019-2020 parole and 2020-2021 incarceration periods, as compared to the

28  records relating to L.S.'s December 2021 and January 2022 suicide attempts and hospitalizations.

*See* AR 22-25.

L.S. argues that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for discounting his statements regarding the limiting effects of his mental impairments. The Commissioner maintains that the ALJ reasonably discounted L.S.'s allegations of disabling mental impairments.

### 2.    Legal Standard

An ALJ is not "required to believe every allegation" of impairment. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014). In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. First, "the claimant must produce objective medical evidence of an underlying impairment or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (cleaned up). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "only by offering specific, clear and convincing reasons for doing so." *Id*. That is, the ALJ must make an assessment "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Id*. At the second step, "a claimant is *not* required to show that [his] medically determinable impairment could reasonably be expected to cause the severity of the symptom [he has] alleged, and is *not* required to produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Ferguson v. O'Malley*, 95 F.4th 1194, 1202 (9th Cir. 2024) (cleaned up, emphasis in original); *see also Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). A reviewing court is "constrained to review the reasons the ALJ asserts." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Tommasetti*, 533 F.3d at

1039.  Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

### 3.    Analysis

To the extent that the ALJ found L.S.'s testimony to be inconsistent with medical evidence of "relatively normal" objective findings from his 2019-2020 parole and 2020-2021 incarceration periods (*see* AR 25), L.S. argues that the ALJ erred in excluding evidence of his two suicide attempts.  For the reasons discussed above, the Court agrees.

With respect to evidence regarding L.S.'s work history, there appears to be no dispute that L.S.'s employment record is sporadic, and that he generally held various jobs for only several months at a time.  *See, e.g.,* AR 230, 256; *see also* Dkt. No. 12 at ECF 16; Dkt. No. 16 at ECF 8.  In discounting L.S.'s allegations regarding the limiting effects of his symptoms, the ALJ appeared to consider only the fact that L.S. held a string of jobs, however briefly, stating that "relatively normal" objective findings in the medical record "are supported by [L.S.]'s ability to obtain and maintain employment, although for short periods at a time, over the years."  AR 25; *see also* AR 21 ("As for applying information, based on his work activities, his ability to stay employed for more than a month at a time, suggest that he does not have difficulties in [applying information].").  L.S. argues that the ALJ failed to adequately address his testimony that he "lost a few jobs because . . . of no show, no call" when he overslept or was "being paranoid."  *See* Dkt. No. 12 at ECF 16 (citing AR 59).  While a claimant's work activity is a factor that an ALJ may consider in determining whether the claimant is disabled, the mere fact that L.S. has a work history is not substantial evidence supporting the ALJ's decision to discount L.S.'s allegations, without also considering evidence that may explain why he held jobs for only short periods of time.  Although the parties dispute whether L.S.'s testimony and other evidence indicate that his work history undermines his allegations regarding the severity of his symptoms (*see* Dkt. No. 16 at ECF 8-9; Dkt. No. 19 at ECF 5-6), there is no indication that the ALJ considered or relied on such evidence.  The Court reviews only the reasons provided by the ALJ.  *Burrell*, 775 F.3d at

1    1138.  For the reasons discussed, the Court agrees that the ALJ erred in assessing only the fact that

2    L.S. has a work history without considering other evidence that may further inform the

3    determination whether L.S.'s symptoms are disabling.

4         With respect to treatment, L.S. acknowledges that he has "a limited history of engaging

5    and sustaining mental health treatment."  Dkt. No. 19 at ECF 4.  Yet, the Ninth Circuit has

6    "particularly criticized the use of a lack of treatment to reject mental complaints both because

7    mental illness is notoriously underreported and because 'it is a questionable practice to chastise

8    one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'"

9    *Regennitter v. Comm'r of Soc. Sec. Admin*., 166 F.3d 1294, 1299–300 (9th Cir. 1999) (quoting

10   *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  Additionally, the record as a whole

11   reflects that L.S. has experienced protracted periods of unstable or no housing (*see, e.g.,* AR 359,

12   454, 456, 481, 484, 508, 686) and sporadic employment (*see, e.g.*, AR 46-47, 230, 256), and has

13   been largely reliant upon the criminal justice system for whatever treatment he has received (*see*

14   *generally* AR 334-532); *see also, e.g.,* AR 479 (noting that L.S. stated he is "not sure if he has

15   insurance coverage" for medications).  It is not clear that the ALJ properly considered these

16   factors in discounting L.S.'s testimony.

17                                    * * *

18        The ALJ did not provide legally sufficient reasons, supported by substantial evidence, for

19   discounting L.S.'s allegations regarding the limiting effects of his impairments.  On this issue,

20   L.S.'s summary judgment motion is granted, and the Commissioner's cross-motion is denied.

21        **E.    RFC**

22        L.S. argues that the ALJ's RFC determination is flawed based on all of the arguments

23   addressed above.  Additionally, L.S. argues that the ALJ's RFC assessment is deficient in two

24   other respects:  (1) the RFC does not adequately reflect the ALJ's own findings that L.S. is

25   moderately impaired in his ability to concentrate, persist, or maintain pace; and (2) the ALJ

26   ignored the VE's testimony that if the claimant identified in either of the ALJ's hypotheticals were

27   off-task for 20% of the workday, then there is no work in the national economy that such a

28   claimant could perform (*see* AR 64).

1       The "ALJ is responsible for translating and incorporating clinical findings into a succinct

2    RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). "In determining

3    a claimant's RFC, an ALJ must consider all relevant evidence in the record," not just medical

4    evidence. *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). An RFC that does

5    not account for a claimant's limitations is defective. *Valentine v. Comm'r Soc. Sec. Admin.*, 574

6    F3d 685, 690 (9th Cir. 2009).

7       L.S. does not adequately articulate or explain why the ALJ's RFC fails to account for the

8    ALJ's assessed moderate limitations in concentration, persistence, or pace. *See Stubbs-Danielson*

9    *v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (ALJ's RFC limiting the plaintiff to "simple,

10    routine, repetitive" work can "adequately capture[ ] restrictions related to concentration,

11    persistence, or pace where the assessment is consistent with restrictions identified in the medical

12    testimony."). However, it is not clear whether the ALJ properly credited the VE's testimony

13    regarding the availability of work for a claimant who is off-task for a portion of the workday.

14       During the April 29, 2022 hearing, the ALJ asked the VE whether two hypothetical

15    claimants would be able to find work. AR 61, 62. In response to the second hypothetical, the VE

16    identified the garment bagger, sorter, and rack loader jobs the ALJ determined that L.S. could

17    perform with the assessed RFC. *See* AR 26, 63. L.S.'s counsel then asked the VE whether a

18    claimant in either of the ALJ's hypotheticals could find work if the claimant was off-task for 20%

19    of the workday. AR 64. The VE testified that all work would be eliminated. *Id.* L.S. contends

20    that the ALJ erred in ignoring this portion of the VE's testimony, when the ALJ credited as

21    "partially persuasive" Dr. Catlin's opinion that L.S. would be off-task more than 30% of the

22    workday, at least when L.S. "is abusing substances." *See* AR 20. For the reasons discussed

23    above, the ALJ's DAA materiality determination was based on assumptions about L.S.'s

24    substance use that are not supported by substantial evidence. On remand the ALJ must properly

25    evaluate DAA materiality, the medical and other evidence (including the prior administrative

26    medical findings and Dr. Catlin's opinion), and L.S.'s testimony and allegations. Those

27    assessments may in turn affect the ALJ's evaluation of L.S.'s RFC, any relevant VE testimony,

28    and whether L.S. is able to work.

United States District Court
Northern District of California

* * *

As the ALJ's RFC determination is not supported by substantial evidence, on this issue L.S.'s summary judgment motion is granted, and the Commissioner's cross-motion is denied.

### F.    DISPOSITION

For the reasons discussed above, the Court find that remand is appropriate for further proceedings. *Luther v. Berryhill*, 891 F.3d 872, 877-78 (9th Cir. 2018).  42 U.S.C. § 405(g).  It is not the Court's intent to limit the scope of the remand.

## IV.    CONCLUSION

Based on the foregoing, the Court grants in part and denies in part L.S.'s motion for summary judgment, grants in part and denies in part the Commissioner's cross-motion for summary judgment, and remands this matter for further administrative proceedings consistent with this order.  The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: February 23, 2025

Virginia K. DeMarchi
United States Magistrate Judge